UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the matter of:

Lenny Rocco Tosto,                                    Case No.  09-77053-MBM
                                                       Chapter 7
_____ Debtor.  /                     Hon. Marci B. McIvor
Paul Arslanian,

                      Plaintiff,

vs.                                                    Adv. Pro. No.  10-4902

Lenny Rocco Tosto,

_____ Defendant.  /


**OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Plaintiff's Motion for Summary Judgment.

Plaintiff asserts that he lost a significant amount of money as a result of misrepresentations

made by Defendant.  He seeks a judgment for his losses and asserts that the judgment

should be nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4) and (6).  For the

reasons set forth below, Plaintiff's Motion for Summary Judgment is denied.

I.

<u>STATEMENT OF FACTS</u>[1]

Plaintiff, Paul Arslanian ("Plaintiff"), is an attorney and certified public accountant.

His practice is located in Bloomfield Hills, Michigan.

Defendant, Lenny Rocco Tosto ("Defendant") is a licensed real estate broker

employed by Colliers International.  Colliers International is an international commercial

_____

[1]The references to exhibits refer to the Exhibits attached to Plaintiff's Motion for Summary
Judgment (Docket No. 42) and Defendant's Response to Plaintiff's Motion (Docket No. 54).

real estate broker and investment firm.  In addition to his employment at Colliers, Defendant owned companies which buy and sell properties in Michigan, for investment purposes.  Those companies have included LRT Investment Properties, LLC ("LRT") and SBT Properties LLC ("SBT") (Tosto dep, Exhibit 6A at  54, 55, 56 - 57, 66 - 67).  SBT ceased operations several years ago; LRT was still operating at all times relevant to this Complaint.  (Tosto dep., Exhibit 6A at  125, 126, 160; Beer dep., Exhibit 6B at  21 and 22.)  Many of Defendant's real estate transactions included deals with parties tangentially involved in this litigation, specifically, Thomas Beer and Allen Stalter.  (Tosto dep., .Exhibit 5; Defendant's Exhibit 6A, at 103 and Stalter dep, Exhibit 6B.)

On September 9, 2002, Thomas Beer and Allen Stalter organized Laker Group LLC.  The Laker Group was formed to buy and sell properties for investment purposes.  The Laker Group sought to make money for its principals and parties that invested in the properties purchased by the Laker Group.  (Stalter dep., Exhibit B at 12, 32 and 157.)

In January 2005, Defendant and his father Leo Tosto formed T & T Investment Properties, LLC ("T&T").  Defendant and Leo originally each owned a fifty (50%) percent interest in T&T.  The purpose of T&T was to lend money for the purpose of buying and rehabilitating properties, and then selling the properties for a profit.  (Tosto dep., Exhibit 6A at. 58-59, 61-62.)

In October 2005, Thomas Beer and Allen Stalter formed One Nation Financial ("One Nation") in which they each held a fifty (50%) percent interest.  One Nation was a mortgage broker.  (Stalter dep., Exhibit 6B at  38).  One Nation existed, in part, to finance mortgages for purchasers of properties owned by the Laker Group.

2

Between 2005 and 2007, T&T worked with the Laker Group and One Nation. T&T provided money to the Laker Group for the purchase of properties and to One Nation to fund mortgage loans. These transactions were profitable for both Defendant and T&T. Tosto Affidavit, Exhibit 5; Tosto dep., Exhibit A at 50, 51.)

In 2007, Plaintiff sought the services of Defendant, in his capacity as a commercial real estate broker, to locate an office building for Plaintiff's law firm. Although Defendant did not locate a building, Plaintiff and Defendant discussed possible investment opportunities. Defendant told Plaintiff about T&T, the real estate investment business which Defendant owned with his father. Defendant also explained in a broad sense how T&AT made money through investing in real estate deals. (Arslanian dep., Exhibit 6E at 64-67.)

In July 2007, Plaintiff invested money with Defendant and T&T for purposes of purchasing and then rapidly reselling a property referred to by both parties as "the Brewster Property." The Property was bought and sold again within 18 days. Plaintiff earned 40% interest on his 18 day investment. (Defendant's Exhibit G.)

Plaintiff proceeded to participate in four other investments with T&T and/or Defendant. In three of the investments (1) Defendant and T&T advised Plaintiff of the investment opportunity; (2) Defendant and T&T both invested in the opportunity (approximately 50 - 50); and (3) Defendant and/or T&T entered into the investments for the purpose of making a profit for both Plaintiff and Defendant. (Tosto Affidavit, Defendant's Exhibit 5; Tosto dep., Defendant's Exhibit 6A at 92-93, 98, 100-101, 125-127.) Each of the investments is detailed below.

INVESTMENT I

Investment I was a "hard money loan" deal. The hard money loan deals worked

as follows: (1) the Laker Group found properties and borrowers to purchase the

properties. The borrowers/purchasers financed the purchase of the properties and any

repair work through One Nation. In exchange for the financing to purchase and repair a

home, the borrower/purchaser granted One Nation a mortgage on the home. In

addition the borrower paid One Nation monthly interest. The expectation was that the

borrower/purchaser would sell or refinance the property shortly after the purchase. If

the borrower/purchaser was unable to sell or refinance the property within a certain

time, the borrower could obtain an extension and pay a fee which ranged from $500.00

to $1,000.00. (Tosto dep., Defendant's Exhibit 6A at 59-60.)

One Nation obtained the funds it loaned to borrowers from "hard money loans"

made to One Nation by investors. T&T was one such investor. When the Laker Group

found a purchaser for a property, One Nation, would advise T&T of the loan necessary

to fund the purchase and repair work. T&T received 15% interest on the use of its

money until the property sold, and four points (4% of the loan amount). (Stalter dep.,

Defendant's Exhibit 6B at 94, 158; Arslanian dep., Defendant's Exhibit 6E at 140-141).

Once the property sold, T&T was repaid the entire amount of its initial investment.

On April 20, 2007, Allen Stalter from One Nation corresponded with Defendant

(by email) to discuss the hard money process. (Defendant's Exhibit 6H.) In the email,

Allen Stalter represented that One Nation would loan the borrower a maximum of 70%

of the appraised value, that the appraised value was to be on an "after repair basis" and

4

that T&T would be protected by an assignment of the mortgage given by the borrower to One Nation. (Defendant's Exhibit 6H; Stalter dep., Defendant's Exhibit 6B at. 40, 77 and 97.) Plaintiff expressed an interest to Defendant in getting involved in the hard money loans. On June 20, 2007, Defendant forwarded Allen Stalter's email to Plaintiff. (Defendant's Exhibit 6H.) In June 2007, Defendant, Thomas Beer, Allen Stalter, and Plaintiff met at Plaintiff's law office to discuss the hard money loan investments. (Stalter dep., Defendant's Exhibit 6B at 73-75; Arslanian dep., Defendant's Exhibit 6E at 102-103.) Both Plaintiff and Defendant (through T&T) decided to invest in Investment 1, Plaintiff and Defendant agreed that Plaintiff and T&T would make a like investment and each would be paid points and interest on the individual loans. (Tosto dep., Defendant's 6H; Arslanian dep., Defendant's Exhibit 6E at 138-139). Both Plaintiff and Defendant expected that T&T and Plaintiff would profit on Investment I, based on the 15% interest, the payment of 4 points at the time the hard loan money was advanced, and the representation that the principal would be repaid when the borrower either sold of re-financed the property. (Tosto Affidavit, Defendant's Exhibit 5; Tosto dep., Defendant's Exhibit 6A at 117-118; Arslanian dep. Defendant's Exhibit 6E at 112.)

Starting in July, 2007, One Nation contacted T&T and Defendant and advised Defendant as to the amount of investment money needed in order to fund each hard money loan. (Stalter dep., Defendant's Exhibit 6B at 56.) Defendant would present the investment opportunity to Plaintiff with no obligation for Plaintiff to participate and with the option of passing on the opportunity. (Arslanian dep., Defendant's Exhibit 6E at 135-136, 148-149, 153-154, 154-165, 167.) If Plaintiff decided to participate, Defendant would tell Plaintiff the amount needed and instruct him to make the checks payable to

5

the title company conducting the closing on the property. Plaintiff would write checks to the title company which were picked up by Defendant or One Nation and taken to the closing. (Arslanian dep., Defendant's Exhibit 6E at 136; and Defendant's Exhibit 6 I.)

Between July 9, 2007 and August 23, 2007, Plaintiff invested $645,539.28 in Investment I properties. (This amount appears to include the Brewster Property.) Plaintiff received fifteen (15%) percent interest on most of the properties bought with Investment I money. The fifteen (15%) percent interest was paid on monthly basis. Plaintiff also received a payment of 4 points (4% percent) on the initial loan amount. As the properties were sold, Plaintiff received his principal investment back. (Arslanian dep., Defendant's Exhibit 6E at 150, 152; Plaintiff's Exhibit 6, Part 8, Exhibit 6Q.) T&T invested approximately the same amount in hard money loans as Plaintiff. (Tosto Affidavit; Defendant's Exhibit 5.) Between July 9, 2007 and September, 2008, Plaintiff received interest, points and some principal payoffs. By September, 2008, Plaintiff had received a total of $391,539.28, including the repayment of principal, interest and points on some of the properties. (Plaintiff's Exhibit 6, Part 8, Exhibit 6Q.) Defendant received approximately the same return on the hard money loans. (Tosto Affidavit, Defendant's Exhibit 5.)

In 2008, the real estate market crashed nation wide. (Stalter dep., Defendant's Exhibit B at 99.) In 2008, One Nation stopped making interest payments on the hard money loans. Some properties which were part of Investment I were never sold and the principal amount invested was not repaid to either Plaintiff or Defendant. Both Plaintiff and Defendant lost money when One Nation stopped making payments on the hard money loans. (Tosto dep., Defendant's Exhibit 5, ¶ 15.) Plaintiff lost $254,000.00.

6

(Plaintiff's Exhibit 6, Part 8, Exhibit Q.)

INVESTMENT II

In September, 2007, Defendant advised Plaintiff of another real estate investment deal.  The Laker Group located 18 properties being sold by a bank as a bulk purchase.  The Laker Group's proposal was that T&T would fund the purchase price for the properties and when the Laker Group sold the properties, the Laker Group would split the profits evenly with the T&T.  Defendant proposed to Plaintiff that Plaintiff and T&T split the cost of purchasing the foreclosed property and split T&T's share of the profits.  (Tosto dep., Defendant's Exhibit 6A at 196, 197.)

The Laker Group never represented that interest would be paid on the money invested with the Laker Group for purchasing the property.   (Stalter dep., Defendant's Exhibit 6B at 144-145, 171-173.)  On September 26, 2007, Thomas Beer from The Laker Group sent Defendant an email stating:

> Just so we are on the same page with the bulk sale: 50 / 50
> split on profits
>
> We never came to a conclusion on selling costs / holding
> costs.  We had talked about 8% on the $, 10% to cover our
> overhead and selling costs.  Might be easier to expense all
> selling fees and split 50 / 50.  Let me know what you think.

(Defendant's Exhibit 6Q.)

On or about September 28, 2007, Plaintiff and T&T each invested approximately $133,000.00 in the bulk sale purchase.  The Laker Group made the purchase of the properties and subsequently marketed the properties.  A few of the properties sold quickly.  For example, a property located at 23151 Beech, sold at the end of December, 2007.  That sale was profitable and the Laker Group and T&T split the profits.  Fifty

7

(50%) percent of the T&T profit was paid to Plaintiff.  Defendant emailed Plaintiff on

October 12, 2007 stating:

> Paul:
> This will fund your account probably on Monday.  It is the
> principal balance due you on the bulk purchase we did a
> couple of weeks ago.  We will get check for proceeds early
> next week.  Profit looks to be somewhere around $17,000.
> Laker Group take is 50% = $8,500.  You and [I] each take
> $4,250.00

(Defendant's Exhibit 6, Part 1, Exhibit 6R.)

Another property which sold quickly was a property located at 23351 Lexington.

That property was sold in October, 2007 to Anthony Larock.  Mr. Larock did contracting

work for the Laker Group.  Mr. Larock purchased the property for $55,000.00 which

generated a profit for the Laker Group and T&T.  Fifty (50%) percent of T&T's profits

($3,073.60) were paid to Plaintiff.  Mr. Larock subsequently obtained a "hard money

loan" from One Nation to repair the property and pay off the amount used by Mr. Larock

to purchase the property.  The funding for the hard money loan came from T&T

($80,000.00).  The Lexington property was not a property for which Plaintiff had agreed

to fund a "hard money loan"; Plaintiff's investment in the property was limited to his

investment in the original bulk purchase (Plaintiff's Exhibit 16, Part 8, Exhibit 6Q.)

Because T&T provided the funding for the "hard money loan", T&T received four (4%)

percent of the loaned amount and interest from the date the money was loaned until the

date Mr. Larock sold the property.  Mr. Larock subsequently sold the property for

$125,000.00.  From the $125,000.00 sale proceeds, T&T recovered its initial investment

of $80,000.00.  Plaintiff was not paid any money on the final sale of the Lexington

property because Plaintiff had never invested funds in the "hard money loan" made by

8

T&T to One Nation.

As noted above, in 2008, there was a crash in the real estate market. Several of the homes in the bulk sale investment were sold at a loss and six of the properties were never sold. From the houses that were sold, Plaintiff received a $109,731.22 on his investment and a profit of $7,443.83 on the houses that were sold. Since Plaintiff had invested $133,138.54, Plaintiff lost $15,963.49 on his original investment. T&T lost a similar amount of money. (Tosto Affidavit, Defendant's Exhibit 5; Plaintiff's Exhibit 6, Part 8, Exhibit 6Q at.2.).

INVESTMENT III

On July 25, 2008, Defendant, by email, proposed another investment opportunity to Plaintiff:

> Paul:
> I am doing 2 senior deals first of the week. These are non Laker Group deals. Already have the 2 buyers/tenants for the properties. Each senior is 67 years old. Renovation should take 3 weeks and deal should close out within 60 total days from acquisition. Investment (including the renovations) is $180,000. Deal structure has me profiting annualized return of 60% or 5% per month. Thus, partner/contractor (Craig Covert) is motivated to get things done in timely manner. When deal closes out in 60 days, my take is $16,000. If deal takes 90 days (which it should not because buyer is in hand and has already signed paperwork) then my take is $24,000. If deal gets done in 30 days, my take is $8,000. You get the picture. Would you like 50% of these two deals?

(Plaintiff's Exhibit 6, Part 10, Exhibit 6FF.)

Later that day Plaintiff wired $80,000.00 to LRT Investment Properties, a company owned by Defendant. (Defendant's Exhibit 6U). Subsequently the money was transferred to Craig Covert for the purpose of purchasing two pieces of property. In

9

addition to the $80,000.00 provided by Plaintiff, Defendant contributed $60,432.81 and Mr. Covert contributed $3,502.81 to the investment. (Plaintiff's Exhibit 6, Part 10, Exhibit 6HH.) Mr Covert used the funds to purchase two pieces of property referred to as the Santa Barbara property and the Wildmere property.

The Santa Barbara property sold in February of 2009, for $75,774.62. Mr. Covert allocated $59,251.88 of the sale proceeds to "costs" and $16,522.74 to "profit." Plaintiff was paid fifty-seven (57%) percent of the costs ($31,776.97) and thirty-three and one-third (33 1/3%) percent of the profit ($5,507.58) for a total payment of $37,284.55. Defendant was paid forty-three (43%) percent of the "costs" ($23,972.10) and thirty-three and one-third (33 1/3%) percent of the "profit" ($5,507.58) for a total of $29,479.68. Mr. Covert paid himself one hundred (100%) percent of his principal investment ($3,502.81) and thirty-three and one-third (33 1/3%) percent of the "profit" ($5,507.58) for a total of $9,010.39. (Plaintiff's Exhibit 6, Part 10, Exhibit 6HH.)

The Wildmere property was never sold. Plaintiff lost $42,715.45 on his original investment in Investment III. (Plaintiff's Exhibit 6, Part 7 Exhibit 6Q.)

INVESTMENT IV

In the spring of 2008 (sometime between March and May) Thomas Beer, from the Laker Group, presented an investment opportunity to Defendant. Thomas Beer and the Defendant had been involved in real estate deals together since 2000. Thomas Beer represented this new deal as an investment in an "oil bond." The "oil bond" was purported to generate a twenty (20) to sixty-five (65) percent return on the investment. (Beer dep., Defendant's Exhibit 6N at 96, 97.) Starting in April, 2008, Defendant, through T&T, invested $170,000.00 in this investment. (Tosto dep., Defendant's Exhibit

10

6A at. 138-140.)  Fifty thousand ($50,000.00) dollars of the T&T investment was at

some point, by agreement of Thomas Beer and Defendant, rolled into another

investment.  (Tosto dep.,  Defendant's Exhibit 6A at 147.)

In fact, there was no "oil bond."  Thomas Beer was investing his own money and

T&T's money in a fund "managed" by Mike Winans.  Although there were no documents

to substantiate the existence of an "oil bond," Thomas Beer sent Defendant the

following email on May 7, 2008:

> I have 200k of family money in at 60 percent.  Putting in
> another 180.  Deal is solid and been paying out every three
> 3 months.  Literally zero risk.

On that same date, Thomas Beer sent Defendant another email stating:

> How much do you want to put into the oil bond?  It would
> help if the wire went out today.  I need to have it out by noon
> tomorrow.

(Defendant's Exhibit 6AA.)

It is not clear whether Defendant actually sent money in response to these emails.

On June 8, 2008, the following email exchange was initiated by Defendant to

Plaintiff:

> Have an opportunity with my brother in law to put $$$ to
> work at annualized 20% return in 3 month increments
> ($100,000 yields $5000 every 3 months).  Money stays in
> account.  Program begins this Friday and runs thru Sept 13,
> 2008.  You have ability to opt out every 3 months if you
> require your dollars for another use or renew for another 3
> months.  We are going to do this on our end.  Let me know if
> you want to tag along and if so, for what amount.

Plaintiff replied:

> Is the investment secured?

Defendant responded:

> Has a T-note and insurance bond behind it.  I like what is
> here.

Plaintiff responded:

> If I do a couple hundred thousand, using the credit line, I
> think I will regret based upon anything else that may come
> along?

Defendant responded:

> I like that it is in essence a 90 day deal.  Have option to
> renew at end of 90 or takes your $$ back.  Your call.  No
> obligation.

Plaintiff responded:

> Feel confident enough in security that I would do 300k?
> That is what I am likely to do if so.  Are you going big?

Defendant responded:

> I have funds to do $250,000 which yields $12,500 per 90
> days.  $300,000 would yield $15,000 per 90 days.

Plaintiff responded:

> . . .  Tell me how/when to handle the money.

Defendant responded:

> . . .  Send monies to me and I will forward to Chris.  Going to
> do this under one account.  I will 1099 you at end of year.
> Account instructions are attached.

(Defendant's Exhibit 6BB.)

On June 10, 2008, Plaintiff wired $300,000 to Defendant's LRT account.

(Defendant's Exhibit 6CC.)

Defendant did not send the $300,000 received from Plaintiff to his brother in law

12

Chris Peganus.  Instead, Defendant sent it to a bank account at Comerica Bank in the name of Thomas Beer.  (Defendant's Exhibit 6CC; Tosto dep., Defendant's Exhibit 6AA, p. 158.)

On June 11, 2008, Thomas Beer sent Defendant the following email:

> Subject: WIRE
> Wire has hit.
> Start Date: 6-11-08
> End Date: 9-11-08
> 300k @ 65% / 12 + $16250 per month
> $16,250 * 3 Months = $48,750 Paid on September 11th

(Plaintiff's Exhibit 6, Part 10, Exhibit 6JJ.)

On June 12, 2008, Thomas Beer sent Defendant the following email:

> If you have additional money to work, the oil bond is
> unlimited and renews every 3 months.  We will have to work
> the investors money 1st.  65 percent return in cash is tough
> to beat.  He just confirmed that he can work millions.

(Plaintiff's Exhibit 6, Part 11, Exhibit 6KK.)

In mid September, 2008, Thomas Beer became aware that there was not going to be a distribution on the "oil bond."  Mr Beer stated in his deposition with regard to the "oil bond" investment:

> Well, after - -so essentially everything was fine until about
> Labor Day, and that's when the $300,000 was scheduled to
> hit.  No one got paid, I knew other investors that were
> involved in this.  No one got paid and Mike kind of went into
> hiding.  And I had a meeting with Mike Winans and I said
> you've got to get me some money because my investors are
> not gonna be happy and he got me $140,000, and of that, I
> gave Len $120,000.

(Beer dep., Plaintiff's Exhibit 6, Part 7, Exhibit 6N, p. 108.)

On September 18, 2008, Defendant sent Plaintiff the following email:

13

> Hi Paul:
> I have asked Laker Group for a summary of those paying
> and those not paying on the loans.
>
> The 90 day deal $$$ is being forwarded my way.  I will have
> this weekend.
>
> The renewal automatically took place.  Needed 30 day
> notice.  Principal monies come due in December and all $$$
> returned at that time.

(Plaintiff's Exhibit 6, Part 11, Exhibit 6QQ.)

On October 1, 2008, Defendant sent Plaintiff a cashier's check for $15,000.00,

funds which allegedly represented 90 days worth of interest on the $300,000 investment

made in June 2008.  (Plaintiff's Exhibit 6, Part 11, Exhibit 6UU.)   The $15,000.00

payment was not a dividend from the oil bond - it was money withdrawn from

Defendant's personal account.  (Tosto dep., Defendant's Exhibit 6A at 156.)

At some point between September and November, 2008, Thomas Beer advised

Defendant that the "oil bond" investment had been a ponzi scheme orchestrated by

Mike Winans.  (Plaintiff's Exhibit 6, Part 11, Exhibit 6OO - Tosto memo to Tosto's father,

paragraph regarding "Bucket 2"; Beer Dep., Plaintiff's Exhibit 6, Part 7, Exhibit N at 114,

115.)

On December 2, 2008, Plaintiff contacted Defendant by email:

> Can you let me know on what days the two loans will be paid
> (300k and 80k).  Will they go directly against my credit line
> on [sic] come as a check to me?  Pls remember to
> encourage Al to avoid all being characterized as interest
> income this year.

(Plaintiff's Exhibit 6, Part 11, Exhibit 6VV.)  Defendant never replied to Plaintiff.

On December 15, 2008, Plaintiff sent Thomas Beer the following email:

14

Subject: Investments
I just left a voicemail for you Tom, as I am sure you know.  I
am headed to the police department in order to discuss this
matter with a detective, as I was made aware only an hour
ago.

For now, you might consider cooperating to whatever extent
you can.  I will need a copy of all documents relating to the
"crude oil bond" investment.

(Plaintiff's Exhibit 6, Part 11, Exhibit 6WW.)  Plaintiff was never paid back any of his

principal investment of $300,000.

On December 3, 2009, Defendant filed a voluntary petition under Chapter 7 of

the Bankruptcy Code.  Plaintiff is listed on Defendant's Schedule F as an unsecured

creditor.  The debt is listed as business debt and the amount is listed as both "disputed

and unknown."

On March 16, 2010, Plaintiff filed an adversary complaint alleging that Defendant

has a non-dischargeable obligation to Plaintiff in an unknown amount.  The complaint

seeks any judgment obtained to be held non-dischargeable pursuant to 11 U.S.C.

§ 523(a)(2), (4) and (6).  On February 25, 2011, Plaintiff filed a Motion for Summary

Judgment.  While Plaintiff alleges non-dischargeability or seeks a non-dischargeable

judgment under 11 U.S.C. § 523(a)(2), (4) and (6), the general argument in the Motion

for Summary Judgment is that Defendant made material misrepresentations to Plaintiff,

that the misrepresentations were made with the intent to defraud Plaintiff, and that

Plaintiff has suffered significantly as a result of Plaintiff's conduct..

On March 31, 2011, Defendant filed a Response to Plaintiff's Motion for

Summary Judgment.  Defendant's general argument is that Defendant and Plaintiff

were co-investors and as such, Defendant never intended to defraud Plaintiff.

15

Defendant argues that he was trying to make money for both Plaintiff and Defendant. Defendant further argues that Plaintiff never exercised any diligence in investigating the investments proposed by Defendant, and that the damages suffered by Plaintiff resulted from Plaintiff's lack of due diligence and circumstances beyond Defendant's control.

II.

## JURISDICTION

Bankruptcy courts have jurisdiction over all cases under Title 11 and all core proceedings arising under Title 11 or arising in a case under Title 11. *See* 28 U.S.C. §§ 1334 and 157. Core proceedings include proceedings to determine dischargeability. 28 U.S.C. § 157(b)(2)(I).

III.

## STANDARD FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(c) for summary judgment is incorporated into Fed. R. Bankr. P. 7056(c). Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. 317, 323. A "genuine" issue is one where no reasonable fact finder could return a judgment in favor of the non-moving party. *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). Once the movant meets this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the non-moving party, the motion should be granted." *Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146, 149-50 (6th Cir. 1995) (internal quotation marks and citation omitted).

The Court may sua sponte grant summary judgment to the non-moving party if that party is entitled to judgment as a matter of law. *K.E. Resources, Ltd. v. BMO Financial, Inc. (In re Century Offshore Mgt. Corp.)*, 119 F.3d 409, 412 (6th Cir. 1997).

IV.

ANALYSIS

A.     11 U.S.C. § 523(a)(2)(A): Non-Dischargeability Based on Fraud

Section 523 (a)(2)(A) excepts from discharge any debt "for money, property, [or] services . . . to the extent obtained by false pretenses, a false representation, or actual fraud. . . "  To prevail on a claim under this section, a plaintiff must show that:

> (1) [T]he debtor obtained money through a material misrepresentation that at the time the debtor knew was false or that he made with **reckless disregard for the truth**; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Services, Inc. ( In re Rembert)*, 141 F.3d 277, 280 (6th

17

Cir. 1998)(emphasis added). *See also Digital Commerce Ltd. v. Sullivan (In re Sullivan)*, 305 B.R. 809, 823 (W.D. Mich. 2004).

The purpose of section 523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud. *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1451 (6th Cir. 1994). Plaintiff must show each element by a preponderance of the evidence. *Rembert*, 141 F.3d at 281.

While openly false assertions plainly qualify as misrepresentations, "it is well-established that 'material omissions can [also] form the basis of misrepresentation under § 523(a)(2)(A)." *Sullivan*, 305 B.R. at 823, quoting *McHenry v. Ward (In re Ward)*, 115 B.R. 532, 539 (W.D. Mich. 1990). Even where a party fails to prove the standard traditional elements of misrepresentational fraud, the Sixth Circuit has broadly construed fraud in the context of § 523 (a)(2)(A).

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*Sullivan,* 305 B.R. at 824, *quoting McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir., 2000). *See also Mellon Bank v. Vitanovich (In re Vitanovich),* 259 B.R. 873 (6th Cir. BAP 2001).

Intent, under *In re Rembert*, is measured subjectively. 141 F.3d at 281. A debtor intends to deceive a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or

services to the debtor." *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913,

916 (Bankr. N.D. Ohio 2001). Fraudulent intent requires an actual intent to mislead,

which is more than mere negligence. . . A 'dumb but honest' [debtor] does not satisfy

the test." *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir., 1997)(citations omitted).

A debtor's fraudulent intent,

> may be inferred from the totality of the circumstances. The
> bankruptcy court must consider whether the totality of the
> circumstances' presents a picture of deceptive conduct by
> the debtor which indicates an intent to deceive the creditor.'
> The court may consider not only the debtor's conduct at the
> time of the representations, but may consider subsequent
> conduct, to the extent that it provides an indication of the
> debtor's state of mind at the time of the actionable
> representations.

*Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Co. 2002)(quoting

*Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) *aff'd in part and*

*vacated in part by Groetken v. Davis (In re Davis)*, 35 Fed. Appx. 826 (10th Cir.

2002)(citations omitted). "A creditor can present proof of surrounding circumstances

from which a [c]ourt can infer a dishonest intent." *Commercial Bank and Trust v. McCoy*

*(In re McCoy),* 269 B.R. 193, 199 (Bankr. W.D. Tenn. 2001).

As explained by the court in *Haney v. Copeland (In re Copeland)*, 291 B.R. 740

(Bankr. E.D. Tenn. 2003):

> Proving the Debtor's intent to defraud is similar to proving
> the Debtor's knowledge and/or recklessness as to the falsity
> of the representations made. Because intent is a purely
> subjective question, the court must examine the totality of
> the Debtor's actions to determine if she possessed the
> requisite intent to deceive the Plaintiffs. Any benefit of the
> doubt must be resolved in favor of the Debtor, as § 523(a)(2)
> is strictly construed in her favor. *XL/Datacomp, Inc. v.*
> *Wilson (in re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th

Cir. 1994).

*Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).

Once a creditor demonstrates that the debtor intended to deceive the creditor, the creditor must show that the creditor relied on the false representations and that the creditors' loss is a direct result of the misrepresentations.

In this case, this Court distinguishes between Defendant's conduct with regard to Investments I, II and III and Defendant's conduct with regard to Investment IV. The Court will refer to Investments I, II and III as the Real Estate Investments. With regard to the Real Estate Investments, Plaintiff alleges that Defendant made multiple misrepresentations. Specifically, Plaintiff asserts that Defendant misrepresented the quality of the investments, the rate of return that could be generated from the investments, and the identity and credit worthiness of the borrowers/purchasers of the various homes. In order to prevail on a non-dischargeable fraud claim, however, the creditor must not only show that misrepresentations were made but that the debtor knew that those representations were false at the time he made them. The record in this case indicates that much of what Defendant represented to Plaintiff had been true in the pre-2008 real estate market. Prior to 2007, Defendant had invested profitably in investments similar to those he recommended to Plaintiff. After Plaintiff and Defendant made Investments I, II and III, some of the individual sales within each investment generated a profit. The record viewed as a whole demonstrates that to the extent Defendant made misrepresentations, Defendant believed his representations to be true. It is only with the benefit of hindsight that some of the statements made by Defendant turned out to be inaccurate.

Plaintiff also argues that Defendant misrepresented his role in the real estate investments. Plaintiff alleges that he believed Defendant was acting in his capacity as a real estate broker for Colliers International when Defendant proposed the real estate investments to Plaintiff. Plaintiff further argues that he would not have invested in the real estate investments had Plaintiff known that Defendant was proposing the real estate investments in his capacity as a friend and part owner of T&T. There is nothing in the record to support Plaintiff's alleged belief that Defendant was acting as a Collier's employee in proposing the real estate investments. (Plaintiff's Exhibit 6, Part 2, May 22, 2007 email from Defendant to Plaintiff.) This issue was never raised in either Plaintiff's or Defendant's deposition and Plaintiff's argument that Defendant misrepresented the role of Collier's International in the proposed investments is completely unsubstantiated by the record.

Plaintiff also fails to show that the Defendant intended to deceive him. With regard to the Real Estate Investments, Defendant, using funds from the business that he operated with his father, T&T, invested almost dollar for dollar in the same investments Defendant proposed to Plaintiff. The record clearly demonstrates that Plaintiff and Defendant, through T&T, both put money into the investments and Defendant anticipated that they would profit equally. Defendant may have been overly optimistic about the return on the investment, but he was deluding himself and Plaintiff in equal measure. There is no evidence in the record to support the allegation that Defendant intended to deceive Plaintiff. Furthermore, Plaintiff's investment did not result in personal gain for Defendant. As Defendant points out, the majority of the money which Plaintiff invested in Investments I, II and III, was paid either directly to title

21

insurance companies, or was paid to T&T and then immediately paid over to another third party unrelated to Defendant.  Defendant not only failed to receive any benefit from Plaintiff's investment in the Real Estate Investments, Defendant lost as much or more in the exact same investments.

Plaintiff's reliance on *Mellon Bank v. Vitanovich (In re Vitanovich,* 259 B.R. 873 (6th Cir. BAP 2001) to support his fraud argument, is misplaced.  Plaintiff is correct in arguing that the Sixth Circuit has defined fraud broadly.  However, even a broad definition of fraud requires that the debtor have intended to deceive the creditor. "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end design.  **It requires intent to deceive or defraud.**" *In re Vitanovich,* 259 B.R. at 877, quoting *Gerad v. Cole (In re Cole),* 164 B.R. 951 (Bankr. N.D. Ohio 1993).  In *In re Vitanovich*, the debtor had engaged in a check kiting scheme through the use of multiple bank accounts.  The debtor would overdraft one account and cover the overdraft with an overdraft from another bank account.  The debtor knew he had insufficient funds in the various bank accounts to cover the overdrafts and was deceiving the banks by covering up one overdraft with another overdraft.  On these facts, the Sixth Circuit found that while debtor had not made a direct misrepresentation to any bank, debtor was liable for fraud under 11 U.S.C. § 523(a)(2) because his conduct demonstrated an intention to deceive the banks.

The *Vitanovich* case is inapplicable to the facts of the instant case.  As noted above, with regard to Investments I, II and III, Defendant never took Plaintiff's money for his own use, rather he directed Plaintiff's money into the same investments in which

22

Defendant was also investing.  On these facts, Plaintiff cannot establish that Defendant had any intent to deceive Plaintiff.

Plaintiff also argues that Defendant relied on the statements made by Plaintiff about the quality of the investments and the rate of return.  Plaintiff asserts that it was Defendant's responsibility to insure that the investment would be profitable.  Plaintiff's argument fails for two reasons.  First, the deposition and email record in this case establish that Defendant made it clear to Plaintiff that Defendant was relying on the Laker Group, One Nation and Craig Covert to finance, buy, sell, and repair the properties.  Defendant's role was to raise money from investors, including himself and funnel that money to the Laker Group, One Nation and Craig Covert.  Second, the deposition and email record establishes that while Plaintiff asked questions about the nature of the investments, Plaintiff continued to invest money even though he failed to obtain complete answers to his questions.  In other words, Defendant's alleged lack of due diligence did not prevent Plaintiff from continuing to invest in the opportunities proposed by Defendant.

Lastly, Plaintiff cannot show that Defendant's misrepresentations are the cause of Plaintiff's losses in Investments I, II and III.  Plaintiff's records indicate that Plaintiff made a profit on some of the individual properties in Investments I, II and III.  Plaintiff's losses in Investments I and II resulted directly from the Laker Group's inability to sell the houses which made up the investment.  It is well established that the real estate market crashed nationwide in 2008 and the entire country went into a recession.  It is also fair to say that real estate investment was a booming business between 2000 and 2007, due to a seemingly endless appreciation in real estate and the availability of easy credit.

23

Both Plaintiff and Defendant were seduced by the money to be made in the real estate market, and both were damaged when the real estate market crashed. Plaintiff's damages in Investment I and II resulted from circumstances beyond the control of Defendant. With regard to Investment III, Craig Covert represented to Defendant that he could easily market two properties because the buyers would be eligible as senior citizens for easy financing through reverse mortgages. Defendant passed these representations on to Plaintiff and Plaintiff invested in the two properties. Covert sold one property but was unable to sell the other, either because the financing was not quite as easy as he had represented, or because of other misrepresentations made by Craig Covert. In any case, Plaintiff and Defendant's losses in Investment III, resulted directly from Covert's inability to sell one of the houses in which Plaintiff had invested. Plaintiff's losses were not the result of statements made by Defendant.

Plaintiff cannot present any set of facts which could establish that he is entitled to a non-dischargeable judgment pursuant to 11 U.S.C. § 523(a)(2)(A) for losses incurred as a result of his Real Estate Investments I, II and III.

The Court concludes however, that there are questions of fact with regard to whether Plaintiff has a non-dischargeable claim against Defendant for fraud for the monies invested in Investment IV. There is a distinction between misrepresentations allegedly made by Defendant with Investments I through III and his representations about Investment IV. The distinction is that with regard to Investment I, II and III, Defendant's representations were either true at the time he made them, or made without any knowledge that his statements were false. With Investment IV, however, Defendant's representations were false at the time he made them and Defendant knew

24

the representations were false.  Specifically:  (1) Defendant misrepresented to whom the investment money would be sent.  Defendant explicitly represented that any funds invested by Plaintiff would be sent to Defendant's brother-in-law, Chris Peganus. Defendant knew at the time he sought investment founds from Plaintiff that he intended to send the funds to Thomas Beer, <u>not</u> Chris Peganus.[2]  (Tosto dep., Defendant's Exhibit 6A at 131-140.);  (2) Defendant falsely stated that the investment was secured. In response to Plaintiff's question "is the investment secured?", Defendant responded, "Has a T-note and insurance bond behind it.  I like what is here."  (Defendant's Exhibit 6BB.)  There is nothing in the voluminous record to support Defendant's statement;  (3) Defendant misrepresented to Plaintiff that he was investing funds contemporaneously with Plaintiff.  Plaintiff emailed Defendant: "Feel confident enough in the security that I would do 300k? That is what I am likely to do if so.  Are you going big?"  Defendant responded:  "I have funds to do $250,000 which yields $12,500 per 90 days. $300,000 would yield $15,000 per 90 days."  (Defendant's Exhibit 6BB.)  In fact, the record shows that Defendant forwarded Plaintiff's $300,000 directly to Thomas Beer without contributing any additional funds to the "oil bond" investment.  While Defendant previously invested approximately $170,000 in the investment, those amounts were paid by Defendant to Thomas Beer at least a month prior to the investment by Plaintiff.

It is clear that Defendant knowingly made misrepresentations to induce Defendant to invest in Investment IV.  The fact question is whether Defendant made the misrepresentations with the intent to defraud Plaintiff.  Defendant argues that he had no

---

[2]Prior to June, 2008, Plaintiff had made it clear to Defendant that Plaintiff did not want to invest in any investment connected with Thomas Beer.

intention to defraud Plaintiff, that his sole goal in proposing this investment to Plaintiff was to help Plaintiff make money. (Tosto Affidavit, Defendant's Exhibit 5.) Defendant argues that his lack of intent to defraud is substantiated by the fact that Defendant did not retain the $300,000 invested by Plaintiff. The record clearly shows that Plaintiff wired his investment to LRT Investments, and Defendant immediately instructed LRT Investments to forward the funds to Thomas Beer. (Defendant's Exhibit 6CC.)

While Defendant is correct that Plaintiff's investment was immediately forwarded to Thomas Beer, the record is much less clear as to what motivated Defendant to propose this investment to Plaintiff. Defendants rarely admit to an intent to defraud, therefore the Court must consider all the circumstances of the case to determine whether Defendant's intention was fraudulent. The parties' conduct in this case raises the following questions: (1) Why did Defendant knowingly make false statements to Plaintiff regarding Investment IV? (2) Did Defendant make false statements because he knew that without such misrepresentations, Plaintiff would not invest? (3) Why did Defendant decide not to invest any additional funds himself? (4) What were Defendant's financial circumstances at that time? The record demonstrates that by mid-2008 Defendant had lost money in his various real estate investments.[3] Was Defendant hoping to use some of the anticipated profit on Plaintiff's $300,000 investment as a short term loan to himself to buy himself some time?[4]

---

[3]Defendant made his investments through T&T, the company he owned with his father. Many of the investments made by Defendant with T&T funds were made without the knowledge or consent of his father. (Plaintiff's Exhibit 6, Part 11, Exhibit 6OO.)

[4]With prior investments, the record shows that Defendant occasionally invested less than what was represented to Plaintiff, or Defendant repaid the Plaintiff slightly less than Plaintiff's share. Defendant testified that it was always his intention to make up any difference in the amount invested, or the profit

26

There are also questions about Plaintiff's conduct with regard to Investment IV. Specifically: (1) why did Plaintiff rely on Defendant's statements without any corroborating information? (2) Was Plaintiff justified in relying on representations from Defendant, given that Plaintiff is an experienced attorney and certified public accountant?

Both parties in this case have presented an enormous number of documents to the Court in the form of depositions, emails (in most cases both sides have provided the same emails to argue different points), and spread sheets. Unfortunately all these documents are insufficient to resolve the issue of intent. Ultimately, in a case such as this, the resolution of the question of intent turns on the credibility of the parties. The issue of whether Defendant is liable to Plaintiff under 11 U.S.C. § 523(a)(2) for money Plaintiff lost in Investment IV remains for trial.

B.      11 U.S.C. § 523(a)(4):   Nondischargeability Based on Breach of Fiduciary Duty or Embezzlement.

Plaintiff also alleges that the money he lost in Investments I - IV should be a non-dischargeable obligation of Defendant pursuant to 11 U.S.C. § 523(a)(4). Under 11 U.S.C. § 523(a)(4) a debtor is not discharged  from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

The Sixth Circuit has defined the term "fiduciary capacity" as used in § 523(a)(4) narrowly, holding that the term applies only to express or technical trust relationships, where a specific property is placed in the hand of the debtor as trustee. *R.E. America v. Garver (In re Garver),* 116 F.3d 176, 179 (6th Cir. 1997). In other words, the term

---

repaid, from the proceeds of a subsequent sale.

27

"fiduciary" as used in §523(a)(4) does not apply to implied trusts. *Garver* 116 F.3d at 178-79. "There are four requirements for establishing the existence of an express or technical trust: (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 (Bankr. N.D. Ohio 2003).

"[T]he defalcation provision of § 523(a)(4) is limited to only those situations involving an express or technical trust relationship. Defalcation then occurs through the misappropriation or failure to properly account for those trust funds." *Garver*, 116 F.3d at 180 (citations omitted). Defalcation encompasses "embezzlement, the 'misappropriation of trust funds held in any fiduciary capacity,' and the 'failure to properly account for such funds.'" *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency)*, 760 F.2d 121, 125 (6th Cir. 1985)(citations omitted).

Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982)(quoting *Moore v. United States*, 160 U.S. 268, 269 (1895). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicated fraud." *Davis v. Kindrick (In re Kindrick)*, 213 B.R. 504, 508 (Bankr. N.D. Ohio 1997). Embezzlement is commonly understood to occur when a person has legitimate access to funds, and then uses those funds for an illegitimate purpose, for example a bank teller siphons off money from the bank till, or a school treasurer uses the school supplies fund for a trip to Jamaica.

28

In the instant case, Plaintiff alleges that with respect to Investment IV Defendant's debt to Plaintiff is non-dischargeable because Defendant embezzled the funds.

The Court finds that none of the funds invested by Plaintiff were embezzled by Defendant. First, Plaintiff never gave his money to Defendant with regard to Investment IV. On June 10, 2008, Plaintiff wired $300,000 to LRT Investments. The money was immediately forwarded to Thomas Beer. While LRT Investments was owned by Defendant, LRT Investments was merely a conduit to transfer the funds to a third party for investment purposes. Since Defendant did not retain possession of Plaintiff's funds, Defendant could not appropriate the property for a use other than that for which it was entrusted. It is undisputed that Defendant made a misrepresentation about the identity of the third party, but it is also undisputed that Defendant did not retain possession of the money. The party that arguably committed embezzlement in this case is Mike Winans, the originator of the Ponzi scheme. He appropriated Plaintiff's property, by way of Defendant and Thomas Beer, for a purpose other than the one for which it was entrusted. The Court finds that Plaintiff lost $300,000.00 in Investment IV not because it was embezzled by Defendant, but because of the fraud perpetrated by Mike Winans.

In conclusion, the Court finds that there are no questions of fact with regards to whether Defendant embezzled funds from Plaintiff. None of the funds invested by Plaintiff were embezzled. Plaintiff's claims arising out of 11 U.S.C. § 523(a)(4) are dismissed.

C.     11 U.S.C. § 523(a)(6):   Nondischargeability Based On Willful and Malicious Conduct.

With respect to Investment IV, Plaintiff alleges that Defendant's debt to Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6). That section provides:

> (a) A discharge under section 727, 1141, 1228(a),
> 1228(b), or 1328(b) of this title does not discharge an
> individual debtor from any debt -
> (6) for willful and malicious injury by the debtor
> to another entity or to the property of another entity.

Because the word "willful" modifies the word "injury," "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). A willful injury results when the actor either desires to cause the consequences of his actions or "believes that the consequences are substantially certain to result" from his actions. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999) (internal quotation marks omitted). A debtor "must will or desire harm, or believe injury is substantially to occur as a result of his behavior. *Id*, at 465 n. 10.

A person has acted "maliciously" when that person acts "in conscious disregard of his duties or without just cause or excuse." *Gonzalez v. Moffitt (In re Moffitt)*, 252 B.R. 916, 923 (6th Cir. BAP 2000); *Murray v. Wilcox (In re Wilcox)*, 229 B.R. 411, 419 (Bankr. N.D. Ohio 1998). There is no requirement that the person act with ill will, spite or animosity toward the injured party. *Grange Mut, Cas. Co. v. Chapman (In re Chapman)*, 228 B.R. 899, 909 (Bankr. N.D. Ohio 1998).

An act of conversion if willful and malicious, is an injury to property within the scope of this exception. *Morganroth & Morganroth, PLLC v. Stollman (In re Stollman)*, 404 B.R. 244, 262 (Bankr. E.D. Mich 2009), quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934). "Conversion is defined as any distinct act of dominion

30

wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Id* at 263, (internal quotations omitted).

Plaintiff argues that Defendant is liable for conversion of the $300,000 paid by Plaintiff into Investment IV. The Court disagrees. Again, Defendant did not exercise dominion or control over the $300,000. While Defendant did induce Plaintiff to invest the $300,000 in a scheme which turned out to be a sham, there is no dispute that the Defendant did not retain possession of the funds. Plaintiff wired the money to LRT, Defendant immediately directed that the money be forwarded to Thomas Beer. While it is true that Defendant misrepresented the identity of the third party to whom the funds were wired, that single act does not constitute "dominion and control" for purposes of a conversion claim. In order for there to be a conversion claim the dominion and control of another's property has to inure to the benefit of the party exercising dominion and control. In other words, the party charged with conversion has to be converting the property for his own benefit. While Defendant may have hoped to benefit from the eventual return on Plaintiff's investment, Defendant did not convert any of Plaintiff's $300,000.00 to his own use at the time the money was invested.

There is however, a separate issue as to whether Defendant converted funds intended for Plaintiff after Plaintiff's initial investment. At his deposition, Thomas Beer was asked about whether Defendant had ever received a return on his investment in the "oil bond." Mr. Beers testified as follows:

> Q.    Do you know how much money he got back?
> A.    About $350,00.
> Q.    He did get back?
> A.    Yes
> Q.    Do you know when he got that back?

| | |
|---|---|
| A. | Between June - probably between June, '08 and September, '08. |
| Q. | And he would be paid in cash? |
| A. | Yes. |
| Q. | And did you deliver the cash or - - |
| A. | I delivered the cash. |
| Q. | Because all of the cash would come to you - - |
| A. | Uh-huh. |
| Q. | - - because you were the investor? |
| A. | I delivered the cash. |
| Q. | And do you know if he was getting the 65 percent return? |
| A. | He was, and more. |
| Q. | More than 65 percent? |
| A. | Yes. |
| Q. | What was the highest it went up to, do you know? |
| A. | Well, after - -so essentially everything was fine until about Labor Day, and that's when the $300,000 was scheduled to hit.  No one got paid, I knew other investors that were involved in this.  No one got paid and Mike kind of went into hiding.  And I had a meeting with Mike Winans and I said you've got to get me some money because my investors are not gonna be happy and he got me $140,000, and of that, I gave Len $120,000. |
| Q. | And when was that about? |
| A. | I want to say middle of September.  It might have been in October.  Middle of September, October. |
| Q. | And would you have given Len $120,000 based upon his $620,000 investment? |
| A. | I gave Len $120,000 because he had most of the money that was in it. |
| Q. | Yes. But I mean, it was based on his whole investment of $620,000? |
| A. | Yes. |
| Q. | Because you did not know where it all came from? |
| A. | No, no, no, no.  There was just - - as far as I knew, it was Len's money.  I didn't know at that time that - - I don't believe I knew at that time that it was Paul's money.  I'm almost positive I didn't . |

(Beer dep., Plaintiff's Exhibit 6, Part 7, Exhibit 6N at 107-109.)

Defendant's deposition testimony directly contradicts the testimony of Thomas

32

Beer.  At his deposition Defendant testified:

> Q.     Did you ever receive any cash from Mike Winans or
>        the Winans Foundation Trust?
> A.     No.
> Q.     You never received any money in way of distribution
>        or a dividend or anything like that?
> A.     No.
> . . .
> Q.     Do you recall receiving $19,500.00 cash from Mr.
>        Beer in August of 2008?
> A.     I do not.
> Q.     Did you ever receive any cash payment of any
>        type from Mr. Beer at any time?
> A.     I don't remember any cash.
> Q.     Our records show that as of August 9, 2008, your
>        $120,000.00 investment was up for renewal with the
>        Winans.  What did you do with it at that time, that
>        investment in August of 2008?
> A.     I don't even know what we would do with that
>        investment?
> Q.     Did you get paid back?
> A.     No. No.
> Q.     Did you roll it for another period of time?  Did you get
>        paid some interest?
> A.     The longest - - I don't remember.
> Q.     We also show that your $50,000.00 investment would
>        be up for renewal on September 2008.  Did you get
>        paid any interest at that time?
> A.     I don't remember.
> Q.     When you say you don't remember, could you have
>        been paid interest and you just don't recall?
> A.     I don't think so.
> Q.     You don't think so what?
> A.     I don't think I got paid.

(Tosto dep., Defendant's Exhibit 6 at. 146 -148.)

Based on the deposition testimony set forth above, there is a question of fact as

to whether Defendant received any repayment of funds invested in the Ponzi scheme.

If in fact Defendant received funds in September of 2008, as Thomas Beer testified,

those funds were in part, Plaintiff's money.  If in fact Defendant retained a distribution that should have been paid to Plaintiff, Defendant is liable for conversion of those funds. However, if Defendant's testimony is credible, that is that he never received any distribution, or did not receive a distribution attributable to Plaintiff's investment, then Defendant is not liable to Plaintiff for conversion.  Because there is a question of fact on this issue, the issue of whether Defendant ever received a return on his investment in the Ponzi scheme, and the timing and the amount of that return, are issues which remain for trial.

D.      Attorney Fees and Treble Damages.

Plaintiff argues in his Motion for Summary Judgment that as part of his claim for non-dischargeability he is entitled to attorney fees and treble damages on his conversion claim.  The Court will defer ruling on this issue until it is determined whether Plaintiff has a non-dischargeable claim for conversion against Defendant.

E.      Plaintiff's Standing as a Contingent Creditor.

Defendant argues that Plaintiff does not have standing to bring this adversary proceeding because Plaintiff does not have a claim against Defendant.  According to Defendant, "Section 101(5) which defines 'claim,' begins with a 'right to payment...' there is no right to payment here.  Plaintiff gave no money to Len Tosto, there is no agreement evidencing a debt or agreement by Len Tosto to pay Plaintiff, and Plaintiff was aware that he was making investments (i.e., not loans) to third parties.  Plaintiff alleges no facts to the contrary, therefore; there is no right to payment."  (Defendant's Objection to Plaintiff's Reply Brief at 13).

The Court disagrees.  11 U.S.C. § 101(5)(a) defines a claim as follows:

34

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured

11 U.S.C. § 101(12) defines debt as "liability on a claim." The Sixth Circuit has held "by defining "debt" in terms of "claim", Congress has made the meanings of debt and claim coextensive." *See Glance v. Carroll (In re Glance),* 487 F.3d 317, 320 (6th Cir. 2007) (internal quotations omitted).

In the present case, Plaintiff holds a contingent unliquidated claim against Defendant. Many claims in bankruptcy are contingent and as such are unliquidated. Frequently creditors file claims for which debtors deny any liability. In this case, Plaintiff's claim is contingent on a finding of non-dischargeability, i.e. that Defendant made misrepresentations with the intent to deceive Plaintiff and Plaintiff was damaged as a direct result of those misrepresentations. If Plaintiff proves all the elements of a fraud claim with regard to Investment IV, Plaintiff has a claim against Defendant. Similarly, if Defendant retained funds which belonged to Plaintiff, Defendant committed conversion as to the funds retained by Defendant from Investment IV and Plaintiff has a claim against Defendant under § 523(a)(6).

The Court also notes that Defendant listed Plaintiff as a creditor on Schedule F. The debt is listed as disputed. It is inconsistent for Defendant to list Plaintiff as a creditor on Schedule F and to simultaneously deny that Plaintiff is a creditor with standing to bring this adversary proceeding.

V.

CONCLUSION

35

With regard to Investments I, II and III, there is no factual dispute between the parties. Rather, the parties interpret the facts and reach different conclusions regarding Defendant's liability to Plaintiff. For the reasons set forth above, the Court finds that Defendant has no liability to Plaintiff for money Plaintiff lost in Investments I, II and III. Plaintiff's Complaint is dismissed to the extent it seeks damages related to Investments I, II and III. Furthermore, there are no facts which establish a claim of embezzlement. Plaintiff's claims of embezzlement as it relates to Investments I, II, III and IV are dismissed.

There remain factual issues for trial with regards to Investment IV. Those issues are as follows: (1) Were the Defendant's false statements to Plaintiff with regard to Investment IV made with the intent to deceive Plaintiff? (2) Even if Defendant made false representations with an intent to deceive, were the misrepresentations the proximate cause of Defendant's damages? (3) Was Plaintiff's reliance on Defendant's statements with regards to Investment IV reasonable? (4) Did Defendant receive a distribution from the Ponzi scheme? (5) If Defendant received a distribution from the Ponzi scheme, when was that distribution received, and was that distribution attributable to funds invested by Plaintiff? (6) If Plaintiff obtains a judgment in any amount against Defendant, is Plaintiff entitled to attorney fees or treble damages as part of the non-dischargeable amount?

The parties shall appear on May 24, 2011 at 9:00 a.m. to discuss all remaining discovery issues. The Court shall set a trial date at the hearing on May 24, 2011.

Signed on May 13, 2011

_/s/ Marci B. McIvor_
Marci B. McIvor
United States Bankruptcy Judge